BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. BYRD (190634)
byrd@whafh.com
MARISA C. LIVESAY (223247)
livesay@whafh.com
BRITTANY N. DEJONG (258766)
dejong@whafh.com
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone:  619/239-4599
Facsimile:  619/234-4599

*Attorneys for Plaintiffs*

[Additional counsel appear on signature page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARAKA LARIMORE, ADAM MATSCHULLAT and KEITH MAY, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | |
| ALTRIA GROUP, INC. and JUUL LABS, INC., | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiffs Daraka Larimore, Adam Matschullat and Keith May ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by the undersigned attorneys, allege the following against Defendants Altria Group, Inc. ("Altria") and Juul Labs, Inc. ("Juul") for violations of the antitrust and consumer protection laws of multiple states. The allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based upon publicly available information and the investigation conducted by and through their attorneys, including in substantial part the December 20, 2018 Relationship Agreement and the January 28, 2020 Amended Relationship Agreement between Defendants Altria and Juul.

## I.    NATURE OF THE ACTION

1.     This is an antitrust class action against Defendants Altria and Juul concerning anticompetitive agreements between them in which Altria agreed to refrain from competing against Juul in the United States market for closed-system electronic cigarettes ("e-cigarettes") in return for a substantial ownership interest in Juul. Juul was and is the dominant player in the sale of closed-system electronic cigarettes ("e-cigarettes") in the United States ("relevant market"). E-cigarettes are electronic devices that deliver nicotine to a user by vaporizing a liquid nicotine solution. In a closed system, the liquid is contained in a pre-filled, sealed cartridge or pod.

2.     In light of declining sales in the market for traditional cigarettes and a shift by consumers to alternative nicotine delivery devices, Altria viewed participation in the e-cigarette market as essential to its long-term survival. In 2013, Altria entered the market through its subsidiary Nu Mark LLC. Its MarkTen e-cigarette closed system entered the market in 2014, and Altria spent more than $100 million to broaden its e-cigarette offerings through an acquisition.

3.     In 2015, Juul entered the relevant market with a sleek new device and quickly captured a substantial share of the market. By 2018, Juul had amassed market share of over 70 percent,[1] stunning Altria and other competitors. Juul's swift rise posed a grave competitive threat

---

[1]     Bonnie Herzog & Patty Kanada, *Nielsen: Tobacco All Channel Data Thru 8/11* at 10, WELLS FARGO SECURITIES (Aug. 21, 2018), https://athra.org.au/wp-content/uploads/2018/09/Wells-Fargo-Nielsen-Tobacco-All-Channel-Report-Period-Ending-8.11.18.pdf (last visited Apr. 29, 2020).

to Altria in the both the e-cigarette and traditional cigarette markets. To eliminate that threat, Altria began a two-prong strategy of trying to acquire Juul while continuing to compete aggressively against it. Its efforts to acquire Juul were unsuccessful initially, and Altria introduced a new product known as the MarkTen Elite which both physically and structurally closely resembled Juul's product.

4.     Altria continued to press the acquisition. In the fall of 2018, Juul agreed to negotiate with Altria under the condition that Altria stop competing with Juul in the market for e-cigarettes. Discussions would not begin until Altria had pulled its products off the shelves. Altria, at first, refused to consider this condition, but in October 2018 it succumbed to the pressure and began to withdraw its e-cigarette products from the relevant market.

5.     Two months later in December of 2018, Altria announced its intention to cease competing entirely in the relevant market.[2]

6.     Approximately two weeks after making this announcement, Altria disclosed that, on October 20, 2018, it had executed a Purchase Agreement and related agreements (the "Transaction") with Juul.

7.     Under the Purchase Agreement, Altria purchased a 35% non-voting stake in Juul, which Altria could convert to a voting stake upon receiving Hart-Scott-Rodino approval. In addition, Altria and Juul executed:  (i) a Relationship Agreement, which contained a non-compete provision (the "Non-Compete") restricting Altria from competing in the relevant market; (ii) a Services Agreement, whereby Altria agreed to provide a variety of support services for Juul; (iii) an Intellectual Property License Agreement licensing Altria's e-cigarette intellectual property to Juul; and (iv) a Voting Agreement providing Altria representation on Juul's board of directors following the conversion of its shares. Pending Hart-Scott-Rodino approval, the transaction provided Altria the right to appoint one of its executives to a non-voting "observer" position on Juul's board.

---

[2]     *See* MarkTen Discontinuation Notice (Dec. 19, 2018), https://www.markten.com (last visited Apr. 29, 2020).

8.    Altria's investment in Juul and its exit from the market not only eliminated its existing e-cigarette product but also, through the Non-Compete, halted its ongoing innovation efforts toward developing a new and improved portfolio of products. Thus, consumers lost the benefit of current and future head-to-head competition between Altria and Juul, and between Altria and other competitors.

9.    The transaction eliminated a threat to Juul's market dominance and required Altria to dedicate its vast resources, including distribution and shelf-space, to ensure Juul's continued market dominance.

10.    After executing the transaction, Altria appointed its Chief Growth Officer as its observer on the Juul board of directors. Following that executive's departure from Altria to become Chief Executive Officer of Juul, Altria appointed its Chief Financial Officer and Vice Chairman to fill the observer position.

11.    The Transaction's anticompetitive effects were particularly clear in the market for closed-system e-cigarettes given high barriers to entry, such as U.S. Food & Drug Administration ("FDA") approval. Repositioning new products in the market was also unavailing to counter the anticompetitive impact of the Transaction. Defendants cannot show the transaction restricting competition resulted in cognizable efficiencies sufficient to outweigh the competitive harm caused by Altria's agreement to exit the relevant market. Nor can Defendants point to pro-competitive benefits that could not have been achieved through less restrictive means. In fact, much of the Defendants' collaboration was restructured in January 2020 to eliminate its marketing aspects, further reducing the scope of theoretical benefits from their agreements.

12.    Defendants' conduct has illegally restrained competition in the relevant market in violation of federal antitrust laws. As a direct and proximate result of Defendants' anticompetitive conduct, entities that purchased Juul products were overcharged and sustained injury to their business and property.

## II.    JURISDICTION & VENUE

13.    This Court has jurisdiction over the federal claim under Section 16 of the Clayton Act, 15 U.S.C. § 26, as well as under 28 U.S.C. §§ 1331, 1337.  The Court has jurisdiction over

the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy.  Independently, this Court also has subject matter jurisdiction over the state law claims under 28 U.S.C. § 1332 because the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than one hundred members in the Nationwide Class and in each of the State Classes, and at least one member of the Nationwide Class and of each of the State Classes is a citizen of a state different from that of one of the Defendants.

14.    Venue is appropriate within this district under 28 U.S.C. § 1391 because, at all relevant times, Defendants transacted business within this district, and the interstate trade and commerce described hereinafter is carried out, in substantial part, in this district. Further, Defendants and/or their agents may be found in this district.

15.    The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this district.

### III.    PARTIES

16.    Plaintiff Daraka Larimore is a resident of the Santa Barbara County, California. Plaintiff purchased Juul products indirectly during the Class Period.  Plaintiff was injured in connection with his purchases during the Class Period.

17.    Plaintiff Adam Matschullat is a resident of the San Diego County, California. Plaintiff purchased Juul products indirectly during the Class Period.  Plaintiff was injured in connection with his purchases during the Class Period.

18.    Plaintiff Keith May is a resident of Palm Beach County, Florida. Plaintiff purchased Juul products indirectly during the Class Period.  Plaintiff was injured in connection with his purchases during the Class Period.

19.     Defendant Juul is a Delaware corporation headquartered at 560 20th Street, San Francisco, California. Juul is the leading manufacturer of closed-system e-cigarettes, generating over $1 billion in sales in 2018.

20.     Defendant Altria is a Virginia corporation headquartered at 6601 West Broad Street, Richmond, Virginia. Altria is one of the country's largest tobacco companies and was formerly a manufacturer of closed-system e-cigarettes. Altria generated more than $25 billion in global revenues in 2018 and, until the Relationship Agreement, participated in the closed e-cigarette market under the MarkTen and Green Smoke brands.

## IV.     SUBSTANTIVE ALLEGATIONS

**Development of E-Cigarettes**

21.     The e-cigarette industry, to a large extent, reflects an evolution of the traditional cigarette industry, with many of the same tobacco companies competing to get consumers hooked on their addictive products.

22.     A 1988 report by the Surgeon General of the United States regarding nicotine and tobacco reached three conclusions:

      a.     Cigarettes and other forms of tobacco are addictive;

      b.     Nicotine is the drug in tobacco that causes addiction;

      c.     The physiological and behavioral processes that determine tobacco addiction are similar to those that determine heroin and cocaine addiction.

23.     Research and public reporting increasingly made these conclusions both inarguable and widely understood.  The health consequences of smoking and the public and political backlash to the addictive properties of nicotine, and the major makers' dishonesty about it, combined to force traditional cigarettes into a long retreat in the U.S. market.

24.     Seeing the writing on the wall, and with a large base of smokers addicted to nicotine, the industry searched for a solution to allow them to continue to sell nicotine delivery devices to U.S. consumers, free of the backlash against smoking.

**The Rise of E-Cigarettes and Juul**

25.    In or about 2010, traditional tobacco companies started entering the U.S. market with e-cigarettes, either developed internally or acquired from companies who had pioneered the technology overseas.

26.    Altria entered the market with its MarkTen e-cigarette in 2013, and over the next several years spent more than $100 million acquiring other existing e-cigarette platforms, notably Green Smoke.

27.    James Monsees, the founder of Juul, saw the potential of e-cigarettes. Monsees has described the cigarette as "the most successful consumer product of all time . . . an amazing product."[3] Because of "some problems" inherent in the cigarette, Juul's founders set out to "deliver[] solutions that refresh the magic and luxury of the tobacco category.[4]

28.    Monsees saw "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products."[5] With a focus on recreating the "ritual and elegance that smoking once exemplified,"[6] Monsees and Adam Bowen founded Pax Labs in 2007 (from which Juul Labs was spun out in 2017) setting out to "meet the needs of people who want to enjoy tobacco but don't self-identify with – or don't necessarily want to be associated with – cigarettes."[7]

29.    Some early leaders faltered, however. Early leader NJOY mimicked the appearance of a cigarette, failed to sufficiently engage consumers, and declared bankruptcy in

---

[3]    Kathleen Chaykowski, *Billionaires-to-be: Cigarette breakers - James Monsees and Adam Bowen have cornered the US e-cigarette market with Juul. Up next: The world*, FORBES INDIA (Sept. 27, 2018), www.forbesindia.com/article/leaderboard/billionairestobe-cigarette-breakers/51425/1 (last visited Apr. 29, 2020).

[4]    Josh Mings*, Ploom model Two Slays Smoking with Slick Design and Heated Tobacco Pods*, SOLID SMACK (Apr 23, 2014), www.solidsmack.com/design/ploom-modeltwo-slick-design-tobacco-pods/ (last visited Apr. 29, 2020).

[5]    *Id.*

[6]    James Monsees – Co-founder and CEO of Ploom, IDEAMENSCH (Apr 11, 2014), https://ideamensch.com/james-monsees/ (last visited Apr. 29, 2020).

[7]    *Id.*

2016.  R.J. Reynolds recalled some products in April 2018 due to overheating. Missteps left room for a disruptive competitor.

30.    In 2015, Pax Labs launched the Juul e-cigarette, a closed-system in a discreet "pod-based" format. The device also offered a much faster delivery of peak nicotine, a faster chemical effect than other vapor systems.

31.    The Juul product is high-tech and also sleek. As depicted below, the Juul e-cigarette looks like a USB flash drive, and it actually charges in a computer's USB drive. It is about the size and shape of a pack of chewing gum; it is small enough to fit in a closed hand. Juul is also easy to conceal. The odor emitted from Juul is a reduced aerosol without much scent – unlike the distinct smell of conventional cigarettes.  These factors are pluses for adult users who want to avoid association with cigarettes.  However, they are also factors that foster adoption by school-age minors, who can conceal both the device and use from parents and school personnel.

 

32.    The thin, rectangular Juul e-cigarette device consists of an aluminum shell, a battery, a magnet (for the USB-charger), a circuit board, an LED light, and a pressure sensor. Juul manufactures and distributes its nicotine formulation as Juul pods, which contain Juul's nicotine liquid. During the Class Period (defined below), Juul has sold its pods in four-packs in a variety of flavors, many of which have no combustible cigarette analog, including mango, "cool" cucumber, fruit medley, "cool" mint, and crème brulee.

33.    Each Juul pod is a plastic enclosure containing 0.7 milliliters of Juul's patented nicotine liquid and a coil heater. When a sensor in the Juul e-cigarette detects the movement of air caused by suction on the Juul pod, the battery in the Juul device activates the heating element, which in turn converts the nicotine solution in the Juul pod into a vapor consisting principally of

nicotine, benzoic acid, glycerin, and propylene glycol. A light embedded in the Juul device serves as a battery level indicator and lights up in a "party mode" display of rainbow of colors when the device is waved around.

34.    The physical design of the Juul device (including its circuit board) and Juul pod determines the amount of aerosolized nicotine the Juul emits. By altering the temperature, maximum puff duration, or airflow, among other things, Juul can finely tune the amount of nicotine vapor the Juul device delivers.[8]

35.    Juul's product flew past Altria's and all other competitors' products to achieve a monopoly share.  By October 2018, Juul had 75% of the market for closed-system e-cigarettes.[9]

36.    Monsees has said that internal industry documents made public under the Master Tobacco Settlement Agreement that had been reached between the cigarette industry, governmental officials, and injured smokers provided a roadmap for speedy entry into the market. "[Industry documents] became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."[10]

37.    Juul researched how cigarette companies had chemically manipulated nicotine content to maximize delivery: "We started looking at patent literature. We are pretty fluent in 'Patentese.' And we were able to deduce what had happened historically in the tobacco industry."[11] Among the documents Juul would have found were those documenting how to

---

[8]      Talih, S., *et al.*, *Characteristics and toxicant emissions of Juul electronic cigarettes*, TOB CONTROL 054616 (Feb 11, 2019), www.ncbi.nlm.nih.gov/pubmed/30745326/ (last visited Apr. 29, 2020).

[9]      Emily McClelland, *Juul and Other Emerging Tobacco Products* (Dec. 6, 2018), https://mstobaccodata.org/wp-content/uploads/2019/01/JUUL-and-Other-Emerging-Products_12.6.18.pdf (last visited Apr. 29, 2020).

[10]     Gabriel Montoya, *Pax Labs: Origins With James Monsees*, SOCIAL UNDERGROUND, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/ (last visited Apr. 29, 2020).

[11]     *Id.*

manipulate nicotine pH to maximize the delivery of nicotine in a youth-friendly vapor that delivers minimal "throat hit"—a combination that creates unprecedented risks of nicotine abuse and addiction, as detailed further below.

38.    Juul also engaged former cigarette industry researchers to consult on the design of their product. Juul's founder James Monsees noted in *Wired* magazine that "people who understood the science and were listed on previous patents from tobacco companies aren't at those companies anymore. If you go to Altria's R&D facility, it's empty." The *Wired* article stated that "some of those people are now on Pax's team of advisers, helping develop Juul."[12]

39.    Juul delivers doses of nicotine that are materially higher than delivered by combustible cigarettes. As a paper published by the European Union citing the United Kingdom Medicines and Healthcare Products Regulatory Agency notes, "an e-cigarette with a concentration of 20 mg/ml delivers approximately 1 milligram of nicotine in 5 minutes (the time needed to smoke a traditional cigarette, for which the maximum allowable delivery is 1 mg of nicotine)."[13] With at least 59 mg/mL of nicotine delivered in a salt form that increases the rate and efficiency of uptake (and even with a lower mg/mL amount), a Juul pod will easily exceed the nicotine dose of a traditional cigarette.

40.    Comparison of available data regarding per puff nicotine intake corroborates the other Juul studies (mentioned above), indicating that Juul delivers about 30% more nicotine per puff. Specifically, a recent study of Juul pods found that "[t]he nicotine levels delivered by the Juul are similar to or even higher than those delivered by cigarettes."[14] The Reilly study tested Juul's Tobacco, Crème Brulee, Fruit Punch, and Mint flavors and found that a puff of Juul delivered 164 ± 41 micrograms of nicotine per puff. By comparison, a 2014 study using larger

---

[12]    David Pierce, *This Might Just Be The First Great E-Cig*, Wɪʀᴇᴅ (Apr 21, 2015), www.wired.com/2015/04/pax-Juul-ecig (last visited Apr. 29, 2020).

[13]    E-Cigarettes,                    European                    Commission, https://ec.europa.eu/health//sites/health/files/tobacco/docs/fs_ecigarettes_en.pdf (citing United Kingdom Medicines and Healthcare Products Regulatory Agency and industry reports).

[14]    Reilly *et al.*, *Free Radical, Carbonyl, and Nicotine Levels Produced by Juul Electronic Cigarettes*, Nicotine Tob Res 2019; 21(9):1274-1278 (the "Reilly study"), https://www.ncbi.nlm.nih.gov/pubmed/30346584 (last visited Apr. 29, 2020).

100 mL puffs found that a Marlboro cigarette delivered 152—193 mcg/puff.[15] Correcting to account for the different puff sizes between the Reilly and Schroeder studies, this suggests that, at 75ml/puff, a Marlboro would deliver between 114 and 144 jig/puff. In other words, empirical data suggests that Juul delivers up to 36% more nicotine per puff than a Marlboro.

41.    Because Juul's nicotine salts actually increase the rate and magnitude of blood plasma nicotine compared to traditional cigarettes, the risk of nicotine addiction and abuse is higher for Juul e-cigarettes than traditional cigarettes. Thus, Juul pods are foreseeably exceptionally addictive when used by persons without prior exposure to nicotine – a fact not disclosed by Juul. These facts have resulted in increased sales for Juul.

42.    The other factor in Juul's spectacular rise was its marketing.  Unlike NJOY and other early entrants, which relied on television and print advertising, Juul aggressively promoted its product through social media, including not only targeted advertising, but also social media influencers.

**The Relationship Agreement**

43.    Juul understood that its meteoric rise did not preclude Altria, with many decades of industry experience and vast capital, from staging a comeback, eroding its market share and margins.  As part of its effort to do just that, Altria began a strategy of attempting to acquire Juul while simultaneously competing aggressively against it in the relevant market. Juul initially resisted.

44.    The negotiations ultimately resulted in a Relationship Agreement dated December 20, 2018, and later in an action by the Federal Trade Commission ("FTC").  The negotiations leading to the relationship agreement are publicly known only because of the FTC action. Because the FTC's Complaint is partially redacted, the account available may be incomplete in some respects.

---

[15]    Megan Schroeder & Allison Hoffman, *Electronic Cigarettes and Nicotine Clinical Pharmacology* (May 2014) Tobacco Control 2014: 23:ii30-ii35, www.ncbi.nlm.nih.gov/pmc/articles/PMC3995273/ (last visited Apr. 29, 2020).

45.     By the summer of 2018, Juul had made it clear to Altria that its acquisition of a stake in Juul was conditioned on Altria's withdrawal from the e-cigarette market and removal of its MarkTen Elite brand. That position was communicated unequivocally by Tim Danaher, the former Chief Financial Officer ("CFO") of Juul; Burns, its former CEO; and Riz Valani ("Valani"), a member of its Board of Directors. On July 30, 2018, Nick Pritzker ("Pritzker"), another member of Juul's Board, sent Howard Willard ("Willard"), the CEO of the Altria Group until April of 2020, a draft term sheet for an agreement that incorporated this requirement.

46.     On August 1, 2018, Pritzker, Valani, Burns, Willard, and Billy Gifford, the Altria Group's CFO, met at the Park Hyatt Hotel in Washington, D.C. to discuss the term sheet; no lawyers for either company attended. Willard understood that Altria's exit from the e-cigarette market was a precondition to any deal with Juul. Altria resisted this condition in discussions held on August 5, 2018. Pritzker, Valani, and Burns reiterated JUUL's position in a mark-up of the term sheet dated August 9, 2018. Valani repeated this blunt message in a meeting with Dinny Devitre, a member of the Altria Group Board of Directors, on August 15, 2018.

47.     When Juul would not budge on this condition, Altria's Willard caved, accepting the non-compete condition and confirming it in writing on October 5, 2018. On October 25, 2018, Altria announced the suspension of its MarkTen Elite business, though Altria falsely cast this as a reaction to the FDA's concerns about e-cigarettes that attracted juvenile buyers.

48.     A few days later, Altria and Juul agreed to the basic deal terms. On December 7, 2018, Altria announced that it was exiting the e-cigarette business entirely.[16] On December 20, 2018, the Altria-Juul agreements were finalized.   In publicly announcing the deal, Juul said in a press release:

> Today, we have been joined by an unlikely – and seemingly counterintuitive – investor in our journey. Altria today announced a minority investment of $12.8 billion into Juul for a 35% ownership in the company along with services to accelerate our mission. We understand the controversy and skepticism that comes with an affiliation and partnership with the largest tobacco company in the US. We

---

[16]     Angelica LaVito, *Altria shutters its e-cigarette brands as it eyes Juul, awaits iQOS decision*, CNBC (Dec. 7, 2018), https://www.cnbc.com/2018/12/07/altria-closes-e-cigarette-brands-as-it-eyes-juul-awaits-iqos-decision.html (last visited Apr. 29, 2020).

were skeptical as well. But over the course of the last several months we were convinced by actions, not words, that in fact this partnership could help accelerate our success switching adult smokers. We understand the doubt. We doubted as well. We made it very clear that any investment would need to meet demanding and specific criteria to ensure that they are committed to our mission.[17]

49.     One of these criteria was that "an investor would have to allow Juul to remain in control."[18] The anticompetitive non-compete clause was not mentioned by Juul.

50.     Article 3.1 of the Relationship Agreement between Juul and Altria set forth the non-compete agreement. It reads, in relevant part:

[Altria] shall not . . . directly or indirectly (1) own, manage, operate, control, engage in or assist others in engaging in, the e-Vapor business; (2) take actions with the purpose of preparing to engage in the e-Vapor Business, including through engaging in or sponsoring research and development activities; or (3) Beneficially Own any equity interest in any Person, other than an aggregate of not more than four and nine-tenths percent (4.9%) of the equity interests of any Person which is publicly listed on a national stock exchange, that engages directly or indirectly in the e-Vapor Business (other than (x) as a result of [Altria's] Beneficial Ownership of Shares or (y) engagement in, or sponsorship of, research and development activities not directed toward the e-Vapor Business and not undertaken with the purpose of developing or commercializing technology or products in the e-Vapor Business) . . . . Notwithstanding the foregoing, (x) the [Altria] and its Subsidiaries and controlled Affiliates may engage in the business relating to (I) its Green Smoke, MarkTen (or Solaris, which is the non-U.S. equivalent brand of MarkTen) and MarkTen Elite brands, in each case, as such business is presently conducted, subject to Section 4.1 of the Purchase Agreement, and (II) for a period of sixty (60) days commencing on the date of this Agreement, certain research and development activities pursuant to existing agreements with third parties that are in the process of being discontinued . . . .[19]

51.     Article 3.2 further prohibited competition on an indirect basis.

52.     As noted above, the Relationship Agreement was amended on January 28, 2020. That amendment is discussed in detail below.

---

[17]     JUUL Labs, Inc., *JUUL Statement About Altria Minority Investment And Service Agreements* (Dec. 20, 2018), https://newsroom.juul.com/juul-statement-about-altria-minority-investment-and-service-agreements/ (last visited Apr. 29, 2020).

[18]     *Id.*

[19]     The full text of the Relationship Agreement is available at https://www.sec.gov/Archives/edgar/data/764180/000119312518353970/d660871dex22.htm.

53.     Contemporaneous analysts noted the potential anticompetitive aspects of what Juul and Altria did in entering into the Relationship Agreement. In one 2019 article, it was stated:

> This deal directly removes Altria as an independent competitor in the vaping market by terminating its sales of MarkTen. Before Juul entered the US vaping market, Nielsen data from mass market retail (eg, pharmacies and grocery stores) indicated that Altria had a 16% share and the four cigarette companies had a 72% combined share in 2015. By September 2018, Juul had 72% of the market (dollar value, 55% in units sold), while the share of Altria fell to 7% by July 2018 and combined cigarette firm shares fell to 25%. However, mass market retail was estimated to be 40% of the entire vaping market. Although information is limited on market shares in the vape shop or online consumer channels, cigarette manufacturers have generally not sold their vaping products in these sectors. With MarkTen having had a small and declining vaping market share, the impact of their exit from the market is likely to be minimal. However, Altria's potential role as a future competitor is likely more important. After the Juul Labs deal, Altria has less incentive to introduce new vaping products . . . .

> The deal can also impede competition by Altria working with Juul Labs (eg, through onserts on the outside of packages with coupons for Juul and providing their customer lists for marketing purposes) to insure that those smoking Altria products (eg, Marlboro) switch to Juul rather than other e-cigarette companies' products. To the extent that brand loyalty is created for Juul products, new entrants will face greater barriers to market entry. In addition, Altria is likely to help Juul Labs fight patent infringement cases.[20]

54.     The FTC echoed some of these concerns in its Complaint. As the FTC noted in paragraph 62 of its Complaint, the effect of the Juul-Altria agreement was to: (a) "eliminat[e] MarkTen products from the relevant market, thereby eliminating current and future price competition between [Juul and Altria], in particular promotional activity to create awareness and drive sales"; (b) eliminate "current and future innovation competition" between the companies; and (c) eliminate "current and future competition between [Juul and Altria] for shelf space at retailers through rebates and other incentives." All of these identified harms constitute injury to Plaintiffs and members of the Class.

---

[20]    Levy D.T., et al., *Altria-Juul Labs deal: why did it occur and what does it mean for the US nicotine delivery product marke*t at 2 (2019) (footnotes omitted), https://tobaccocontrol.bmj.com/content/tobaccocontrol/early/2019/08/30/tobaccocontrol-2019-055081.full.pdf (last visited Apr. 29, 2020).

55.     Altria acquired a 35% stake in Juul for $12.8 billion as a result of the deal. For this amount, Altria got one "observer" to Juul's Board, at least until the FTC cleared the transaction, which it obviously has not. As the FTC explained at paragraphs 23–24 of its Complaint with respect to the other agreements entered into between Juul and Altria:

> Though it was later amended, under the initial Services Agreement, Altria agreed to provide certain services to [Juul], divided between Initial and Extended Services. The Initial Services included leasing convenience store shelf space to [Juul], regulatory consulting, and distribution support; the Extended Services included direct marketing support and sales services. Under the terms of the Relationship Agreement, the Non-Compete went into effect early in 2019 when Altria began to perform Extended Services. The Services Agreement had an initial six-year term, subject to early termination by mutual consent or in case of material breach, bankruptcy, or insolvency. If the Services Agreement expired, Altria could discontinue the Non-Compete, at which point it would lose its right to appoint [Juul] board members and its pre-emptive right to maintain its 35% stake in the company, but would regain its ability to compete in the market against [Juul].

> The Intellectual Property License Agreement grants [Juul] a broad, non-exclusive, irrevocable license to Altria's e-cigarette intellectual property portfolio.[21]

56.     The Relationship Agreement constitutes *per se* antitrust violations of Section 1 and 3 of the Sherman Act and collusive conduct in violation of Section 2 of the Sherman Act. Juul and Altria are separate companies; neither owned the other. No joint venture was created between them. Instead, they were horizontal competitors who agreed that one of them would exit the market.

**Juul's Regulatory Crisis**

57.     In September of 2018, the FDA announced that it had undertaken the largest coordinated enforcement effort in its history issuing 1,300 warning letters or fines to retailers who sold Juul and other e-cigarettes to minors as part of an "undercover blitz" of brick-and-mortar and online retailers.[22]

---

[21]     Available                                                                                      at: https://www.ftc.gov/system/files/documents/cases/d09393_administrative_part_iii_complaint-public_version.pdf.

[22]     *See* FDA, *FDA takes new steps to address epidemic of youth e-cigarette use, including a historic action against more than 1,300 retailers and 5 major manufacturers for their roles perpetuating youth access*, https://www.fda.gov/news-events/press-announcements/fda-takes-

58.     Juul offered its products in fruit flavors, constructed its device to look like a USB jump drive and to leave few telltale signs of its use, all characteristics leading to its adoption by underage teens who could not legally purchase it but who nonetheless did so in large numbers.

59.     Juul reacted to the FDA criticism. On November 3, 2018, it discontinued retail sales of its Mango, Cucumber, Creme and Fruit Juulpods to third party retailers and instead limited the distribution of these products to Juul's own online shop.[23]

60.     Juul's efforts did not satisfy the FDA.  On September 9, 2019, the FDA sent Juul a warning letter that stated: "Based on our review of the information described above, FDA has determined that Juul adulterated its products under section 902(8) of the FD&C Act (21 U.S.C. § 387b(8)) by selling or distributing them as modified risk tobacco products without an FDA order in effect that permits such sale or distribution."[24]  Thus, Juul was accused of illegally selling its e-cigarettes. Juul responded by first eliminating sales in the United States and its territories of its fruit-flavored Juulpods on October 17, 2019.[25] Thereafter, Juul eliminated sales of mint-flavored Juulpods on November 7, 2019.[26]

61.     The FDA included Altria in its campaign after Altria became a stakeholder in Juul. On February 6, 2019, the FDA accused Altria's Willard of contradicting "the commitments you made to the FDA" in a meeting held on October 18, 2018. He demanded Altria meet again and "be prepared to explain how this acquisition affects the full range of representations you

---

new-steps-address-epidemic-youth-e-cigarette-use-including-historic-action-against-more    (last visited Apr. 29, 2020).

[23]     JUUL    Labs,    Inc.,    *JUUL    Labs    Action    Plan*,    (Nov    13,    2018) https://newsroom.juul.com/juul-labs-action-plan/ (last visited Apr. 29, 2020).

[24]     FDA, *Warning Letter JUUL Labs, Inc.*, (Sept. 9, 2019) https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019 (last visited Apr. 29, 2020).

[25]     JUUL Labs, Inc., *JUUL Labs Suspends Sale Of Non-Tobacco, Non-Menthol-Based Flavors In The U.S.* (Oct. 17, 2019) https://newsroom.juul.com/juul-labs-suspends-sale-of-non-tobacco-non-menthol-based-flavors-in-the-u-s/ (last visited Apr. 29, 2020).

[26]     JUUL Labs, Inc., *Juul Labs Stops the Sale of Mint Juulpods in the U.S.* (Nov. 7, 2019), https://newsroom.juul.com/juul-labs-stops-the-sale-of-mint-juulpods-in-the-united-states/    (last visited Apr. 29, 2020).

made to the FDA and the public regarding your plans to stop marketing e-cigarettes and to address the crisis of youth use of e-cigarettes."[27] Altria, Juul, and FDA Commissioner Scott Gottlieb met in March of 2019, but Gottlieb was reported as saying that the meeting was "difficult" and that "he did not come away with any evidence that public health concerns drove Altria's decision to invest in Juul."[28]  The concurring statement of FTC Commissioners Chopra and Slaughter in support of the filing of the FTC Complaint cited above reached a similar conclusion:

> [I]n October 2018, Altria publicly claimed that it was discontinuing its e-cigarette product due to concerns about youth vaping. This appears to be a pretext, as it was simultaneously looking to strike a massive deal with Juul. With Altria's MarkTen out of the market, basic economic logic suggests that Juul could capture those sales and further dominate the market.[29]

62.    Several states and municipalities likewise took issue with the widespread underage use of Juul's products. In 2019, various states and municipalities began imposing bans on Juul and/or vaping products.[30]

63.    Altria used its power to oust some of Juul's management and replace them with Altria personnel. In September of 2019, Burns resigned as Juul's CEO, and was replaced by K.C. Crosthwaite ("Crosthwaite"), a Senior Vice-President of Altria Group who served as its Chief Growth Officer, oversaw Altria's entry into the e-cigarette market and was Altria's designated

---

[27]    S. Gottlieb, Letter to Howard A. Willard III, dated 6 February 2019, available at https://www.fda.gov/media/122589/download (last visited Apr. 30, 2020).

[28]    K. Rooney, A. LaVito, *Altria shares fall after FDA's Gottlieb describes 'difficult' meeting on Juul*, CNBC NEWS (March 19, 2019), https://www.cnbc.com/2019/03/19/altria-shares-fall-after-fdas-gottlieb-describes-difficult-meeting-on-juul.html (last visited Apr. 29, 2020); A. Edney, *FDA Chief to Keep Heat on E-Cigarette Makers as He Departs*, BLOOMBERG (Mar. 19, 2019), https://web.archive.org/web/20190501083309/https://www.bloomberg.com/news/articles/2019-03-19/gottlieb-says-fda-may-need-to-pull-nicotine-pods-from-market (last visited Apr. 29, 2020).

[29]    https://www.ftc.gov/system/files/documents/public_statements/1570265/statement_of_comm_chopra_in_the_matter_of_altria-juul.pdf at 2.

[30]    *See* DRUGWATCH, *Juul Ban*, https://www.drugwatch.com/e-cigarettes/juul-ban/ (last visited Apr. 29, 2020).

interim "observer" on Juul's Board pursuant to the terms of the Relationship Agreement.[31] Crosthwaite is in the process of revamping certain executive positions. In October of 2019, he brought in as Juul's new chief regulatory officer Joe Murillo ("Murillo") of the Altria Group; Murillo was the head of regulations at the Altria Group and previously ran the e-cigarette side of its business.[32]

64.    Altria also took the opportunity to revise some of its December 2018 agreements with Juul. The Services Agreement, Voting Agreement, and Relationship Agreement between Altria and Juul were amended on January 31, 2020. The FTC describes the amendments as follows in paragraphs 26–28 of its Complaint:

> Under the Revised Voting Agreement, after the Antitrust Conversion, Altria will instead have the right to (1) appoint two (of nine) JLI directors; (2) nominate one (of three) [Juul] independent directors; (3) appoint one (of four) members of a Nominating Committee (who would have the right to veto independent director nominations); (4) appoint two (of five) members and the chair of a new Litigation Oversight Committee (which would have responsibility for managing litigation involving both Altria and [Juul], i.e., "Joint Litigation Matters"); and (5) appoint one (of three) members of a Litigation Subcommittee (which would have authority, by unanimous vote, to change [Juul's] senior outside counsel responsible for Joint Litigation Matters). The Revised Voting Agreement would further grant [Juul's] CEO (1) a board seat, (2) a seat on the Litigation Oversight Committee, and (3) a seat on the Litigation Subcommittee.

> The Amended Relationship Agreement gives Altria the option to be released from the Non-Compete if [Juul] is prohibited by federal law from selling vaping products in the United States for at least a year or if Altria's internal valuation of the carrying value of its investment falls below 10% of its initial value of $12.8 billion.

> The Amended Services Agreement eliminates all services except for regulatory support services. The amendment was effective at signing except as regards to

---

[31]    JUUL Labs, Inc., *JUUL Labs Names New Leadership, Outlines Changes To Policy And Marketing Efforts* (Sept. 25, 2019), https://newsroom.juul.com/juul-labs-names-new-leadership-outlines-changes-to-policy-and-marketing-efforts/ (last visited Apr. 29, 2020).

[32]    Carlie Porterfield, *Juul Hires Another Altria Exec To Handle Vaping Crackdown*, FORBES (Oct. 2, 2019), https://www.forbes.com/sites/carlieporterfield/2019/10/02/juul-hires-another-altria-exec-to-handle-vaping-crackdown/#6453ab412c72 (last visited Apr. 29, 2020).

Altria's provision of retail shelf space to [Juul], which service terminates after March 31, 2020.[33]

65.     On January 30, 2020 Altria had filed an SEC Form 8-K that further described the Amended Relationship Agreement as follows:

The amendment to the Relationship Agreement provides for, among other things: (i) following antitrust clearance of the Juul Investment, creation of a Litigation Oversight Committee of the Juul board of directors, which will include two Altria designated directors (one of whom will chair such committee), that will have oversight authority and review of litigation management for matters in which Juul and Altria are co-defendants and have or reasonably could have a written joint defense agreement in effect between them and, subject to certain limitations, will recommend to Juul changes to outside counsel and litigation strategy by majority vote, with disagreements by Juul's management being resolved by majority vote of Juul's board of directors; and (ii) Altria to have the option to be released from its non-compete obligation (x) in the event Juul is prohibited as a matter of federal law from selling vapor-based electronic nicotine delivery systems in the U.S. for a continuous period of at least 12 months (subject to tolling of this period in certain circumstances) or (y) if the carrying value of Altria's investment in Juul is not more than $1.28 billion (which represents 10% of Altria's $12.8 billion initial carrying value of the Juul investment).[34]

66.     The FDA has not prohibited Juul from selling vaping products in the United States and its territories for at least a year. On January 2, 2020, the agency adopted a policy that prioritized its enforcement efforts with respect to e-cigarettes. It stated:

On Aug. 8, 2016, all e-cigarettes and other ENDS [electronic nicotine delivery systems] products became subject to the FDA's tobacco authorities, including the premarket authorization requirements in the Federal Food, Drug, and Cosmetic Act (FD&C Act). All e-cigarettes and other ENDS products on the market at that time needed to have authorization from the FDA to be legally marketed. However, as an exercise of its enforcement discretion, the agency had deferred enforcement of the premarket authorization requirements. To date, no ENDS products have been

---

[33]

https://www.ftc.gov/system/files/documents/cases/d09393_administrative_part_iii_complaint-public_version.pdf

[34]

https://www.sec.gov/ix?doc=/Archives/edgar/data/764180/000076418020000005/a2019form8-kerq42019.htm. The Amended Relationship Agreement itself can be found at https://www.sec.gov/Archives/edgar/data/764180/000076418020000005/exhibit21q42019.htm.

authorized by the FDA — meaning that all ENDS products currently on the market are considered illegally marketed and are subject to enforcement, at any time, in the FDA's discretion.

Beginning 30 days from the publication of the notice of availability of this guidance in the Federal Register, the FDA intends to prioritize enforcement against these illegally marketed ENDS products by focusing on the following groups of products that do not have premarket authorization:

—Any flavored, cartridge-based ENDS product (other than a tobacco- or menthol-flavored ENDS product);

—All other ENDS products for which the manufacturer has failed to take (or is failing to take) adequate measures to prevent minors' access; and

—Any ENDS product that is targeted to minors or likely to promote use of ENDS by minors.

Cartridge-based ENDS products are a type of ENDS product that consists of, includes, or involves a cartridge or pod that holds liquid that is to be aerosolized when the product is used. For purposes of this policy, a cartridge or pod is any small, enclosed unit (sealed or unsealed) designed to fit within or operate as part of an ENDS product.

By not prioritizing enforcement against other flavored ENDS products in the same way as flavored cartridge-based ENDS products, the FDA has attempted to balance the public health concerns related to youth use of ENDS products with considerations regarding addicted adult cigarette smokers who may try to use ENDS products to transition away from combustible tobacco products. In addition to data showing that cartridge-based ENDS products are most commonly used among youth, important findings from the 2019 Monitoring the Future survey focusing on youth use of Juul indicate that youth preference for menthol- and tobacco-flavored e-cigarettes is much lower than that for mint- and fruit-flavored e-cigarettes. Because of the relatively low numbers of youth using both menthol- and tobacco-flavored, cartridge-based ENDS products, these products are not among the current enforcement priorities. However, should the FDA become aware of an increase of youth using any other flavored products (both cartridge-based or otherwise), the agency will take additional steps to address youth use of those products if necessary.

For all other products (cartridge-based or otherwise), including menthol-, tobacco-, and non-flavored ENDS products, the FDA will also prioritize enforcement where the manufacturer fails to take adequate measures to prevent youth access. For example, the FDA will consider whether the manufacturer has implemented adequate programs to monitor retailer compliance with age-verification and sales restrictions or if it has established and enforced penalties against retailers that fail to comply with those programs. The agency also will

consider whether the manufacturer uses adequate age-verification technology (or requires that retailers who sell its products use such technology) to prevent underage access to its website and to prevent underage sales through the internet. In addition, consideration will be given to whether the manufacturer limits (or requires retailers who sell its products to limit) the quantity of ENDS products that a customer may purchase within a given period of time.

The FDA also intends to prioritize enforcement with respect to any ENDS products that are targeted to youth or likely to promote use of ENDS by youth. Examples include: products marketed with labeling and/or advertising that resemble kid-friendly foods and drinks such as juice boxes or kid-friendly cereal; products marketed directly to minors by promoting ease of concealing the product or disguising it as another product; and products marketed with characters designed to appeal to youth.

Importantly, the FDA's enforcement priorities are not a "ban" on flavored or cartridge-based ENDS. The FDA has already accepted and begun review of several premarket applications for flavored ENDS products through the pathway that Congress established in the Tobacco Control Act. Manufacturers that wish to market any ENDS product – including flavored e-cigarettes or e-liquids – are required by law to submit an application to the FDA that demonstrates that the product meets the applicable standard in the law, such as whether the product is appropriate for the protection of the public health. If a company can demonstrate to the FDA that a specific product meets the applicable standard set forth by Congress, including considering how the marketing of the product may affect youth initiation and use, then the FDA could authorize that product for sale.

The guidance also states that, after May 12, 2020, the FDA intends to also prioritize enforcement against any ENDS products that continue to be sold and for which the manufacturers have not submitted a premarket application. For ENDS products other than those in the three groups described above, if premarket applications are submitted by that date, the FDA intends to continue to exercise enforcement discretion for up to one year pending FDA review of the applications, unless there is a negative action by the FDA on such application or the product is authorized to be marketed by the FDA.[35]

67.    Thus, the upshot of the FDA's guidance was that while it had the statutory power to force all e-cigarettes off the market as being sold illegally, it exercised its discretion not to do so and focused its enforcement authority on non-tobacco or non-menthol flavored e-cigarettes

---

[35]    FDA, *FDA finalizes enforcement policy on unauthorized flavored cartridge-based e-cigarettes that appeal to children, including fruit and mint* (Jan. 2, 2020), https://www.fda.gov/news-events/press-announcements/fda-finalizes-enforcement-policy-unauthorized-flavored-cartridge-based-e-cigarettes-appeal-children (last visited Apr. 29, 2020). *See also* 85 Fed. Reg. 720 Jan. 7, 2020.

and e-cigarettes marketed to customers under the age of 21. Juul had ceased selling fruit-flavored or mint-flavored e-cigarettes in October and November of 2019 and had modified its marketing policies so that it did not target persons under the age of 21. To this day, it continues to market e-cigarettes with Virginia Tobacco, Classic Tobacco, and Menthol flavoring. The FDA's notice makes it clear that it has no intention of banning outright the sale of these types of e-cigarettes. The agency will be requiring manufacturers to submit premarket applications for e-cigarettes pursuant to the Tobacco Control Act by May 12, 2020 and this requirement applies to e-cigarettes already being marketed, but the FDA made it clear that tobacco-flavored or menthol-flavored e-cigarettes not being marketed to people under the age of 21 will be subject to an informal grace period of up to one year while the applications are being considered. Juul is on record as saying it will be filing a premarket application in May of 2020.[36] So there is no immediate danger of Juul being "prohibited by federal law from selling vaping products in the United States for at least a year" and the non-compete clause contained in the Relationship Agreement between Juul and Altria remains in full force and effect.[37]

**The FTC Action**

68.     On April 1, 2020, the FTC filed a complaint against Altria and Juul under sections 5(a) and 5(b) of the FTC Act, 15 U.S.C. §§ 45(a), (b), and section 11(b) of the Clayton Act, 15 U.S.C. § 21(b), alleging the Transaction violated section 1 of the Sherman Act, 15 U.S.C. § 1, section 5 of the FTC Act, 15 U.S.C. § 45, and section 7 of the Clayton Act, 15 U.S.C. § 18.

69.     The FTC alleged that the Defendants' conduct unreasonably restrained competition, and that the Transaction substantially lessened competition in the U.S. market for

---

[36]     *See* JUUL Labs, Inc., *Our Commitment To The PMTA Process* (Aug. 20, 2019) https://newsroom.juul.com/our-commitment-to-the-pmta-process/ (last visited Apr. 29, 2020).

[37]     Likewise, Altria has not written down the value of its $12.8 billion investment in JUUL below $1.28 billion. It has written down the value of that investment by a total of $8.6 billion, in separate writeoffs undertaken in October of 2019 and January of 2020. M. Corey Goldman, *Altria Writes Down Another $4.1 Billion of Its Juul Investment*, THESTREET (Jan. 30, 2020), https://www.thestreet.com/investing/stocks/altria-takes-another-massive-writedown-on-juul-investment (last visited Apr. 29, 2020).

closed-system e-cigarettes by eliminating competition between Altria and Juul on price, innovation, promotional activity, and shelf space.

70.    The FTC complaint seeks to restore Defendants' incentives to compete, including divestiture of Altria's equity stake in Juul; rescission of Altria's purchase of that stake; the voiding of all agreements related to the Transaction, including the non-compete agreement and the Services Agreement between Altria and Juul, as well as a prohibition against any future non-compete agreements between Defendants, except with prior approval by the Commission; a prohibition against any transaction between Altria and Juul that combines their businesses in the e-cigarette market, except with prior approval by the Commission; a prohibition against any officer or director of either Defendant serving on the other Defendant's board of directors or attending its meetings; a requirement that, for a period of time, Altria and Juul provide prior notice to the FTC of acquisitions, mergers, consolidations, or any other combinations of their businesses in the e-cigarette market with any other company operating therein; a requirement to file periodic compliance reports with the Commission; and a requirement that Defendants' compliance with the order be monitored at their own expense by an independent monitor.

## V.    THE RELEVANT MARKET

71.    The relevant product market for the purposes of this action is the closed-system e-cigarette market.

72.    E-cigarettes are battery-powered devices that vaporize a liquid solution containing nicotine (an "e-liquid"). There are two broad categories of e-cigarettes: closed-system and open-tank. Closed-system e-cigarettes consist of a device housing a battery and a heating mechanism, and are filled with sealed cartridges or pods that are pre-filled with e-liquid. Examples of closed-system devices include cigalikes, which are similar to traditional cigarettes in size and shape, and pod-based products, such as Juul or MarkTen Elite, which look like USB drives. Subsequent to a FDA flavor ban that went into effect in February 2020, closed-system pods and cartridges are available only in tobacco and menthol flavors.

73.    By contrast, open-tank e-cigarettes incorporate refillable tanks that customers manually fill with e-liquid. Because customers are able to select from (and mix together) a wide

assortment of e-liquids, open-tank e-cigarettes allow a more customizable experience whereby users can experiment with different flavors and nicotine strengths. In addition, unlike with closed systems, users can customize the individual components of an open-tank system, such as the battery, heating coil, and atomizer (which houses the heating coil).

74.     Closed-system e-cigarettes are largely sold in different channels than open-tank products, and open-tank customers tend to seek a different experience than closed-system customers. The vast majority of closed-system e-cigarettes are sold through the multi-outlet channel, which consists primarily of convenience stores. Convenience stores offer a limited range of e-cigarette products, focusing on the highest-velocity brands. In contrast, open-tank e-cigarettes are sold almost exclusively at dedicated vape shops, retail outlets that typically carry an extensive selection of e-liquids and parts for open-tank products and offer a high level of customer service.

75.     Defendants considered their respective Juul and MarkTen product lines to be direct competitors with each other and with other closed-system e-cigarette products and set prices based on competition with each other and with other closed-system products. Defendants further acknowledged that their closed-system e-cigarette products did not compete as closely with open-tank products.

76.     There are no reasonable substitutes for closed-system e-cigarettes. Closed-system e-cigarettes appeal to consumers because they are discreet due to their small size, and convenient due to their self-contained, ready-to-use format. Open-tank e-cigarettes are not an adequate substitute for closed-system e-cigarettes because they are larger, more complex, and require more manual operation by the user. Open-tank e-cigarettes generally appeal to a different customer type, one that appreciates their complexity and customizable nature.

77.     The relevant geographic market is no broader than the United States. Because of FDA's requirements (described below), foreign firms cannot import e-cigarettes into the United States without prior FDA approval.

23

78.     According to Nielson data, retail sales of closed-system e-cigarettes in the United States in 2018 constituted approximately $2.8 billion.[38]

## VI.    THE E-CIGARETTE MARKET HAS HIGH BARRIERS TO ENTRY

79.     Under the FDA regulatory framework, a manufacturer of a new tobacco product, including an e-cigarette, must submit to the FDA a Premarket Tobacco Product Application ("PMTA") and receive the FDA's approval before marketing that product. An e-cigarette that was on the market prior to August 8, 2016 may remain on the market, but the manufacturer of that product must file a PMTA by May 12, 2020 in order to continue marketing it, and must remove the product in the event the PMTA is denied. An e-cigarette that was not on the market prior to August 8, 2016 cannot be marketed until it receives PMTA approval. At the time Defendants executed the Transaction, the deadline for an in-market applicant to file its PMTA was August 8, 2022.

80.     Preparing a PMTA requires a significant amount of resources—time, personnel, and money, which can range from several hundreds of thousands to multiple millions of dollars per product.

81.     The FDA announced on January 2, 2020 that it had finalized a new enforcement policy prohibiting all non-tobacco/non-menthol flavors for cartridge-based e-cigarettes until a PMTA authorization, which went into effect on February 6, 2020.

## VII.    MONOPOLY POWER

82.     Throughout the Class Period, Juul dominated the relevant market and maintained power to control prices and exclude competition in that market.

83.     According to a Wells Fargo report on the tobacco industry based on Nielson scanner data, Juul had amassed a 72 percent market share by August of 2018. Altria's market share at that time was 8 percent.[39]

---

[38]     Bonnie Herzog & Patty Kanada, *Nielsen: Tobacco All Channel BiWeekly Data Thru 11/17*, WELLS FARGO (Nov. 27, 2018) (data source: Nielsen XAOC Including C-Store), https://athra.org.au/wp-content/uploads/2018/12/Wells-Fargo-Nielsen-Tobacco-All-Channel-BiWeekly-Report-Period-Ending-11.17.18.pdf (last visited Apr. 29, 2020)

84. Altria began pulling its products off the market in October 2018. By November, Altria's market share had fallen to 4 percent, and Juul's had grown to over 75 percent.[40]



85. By December 2018, Altria had pulled its products off of the market entirely.

86. The Transaction not only eliminated one of Juul's most successful competitors, it gave Juul access to Altria's vast resources and capital.

87. The Transaction was intended to, and did, significantly increase Juul's monopoly power in the relevant market.

---

[39] Bonnie Herzog & Patty Kanada, *Nielsen: Tobacco All Channel Data Thru 8/11 - Cig Vol Decelerates* at 10, WELLS FARGO (Aug. 21, 2018), https://athra.org.au/wp-content/uploads/2018/09/Wells-Fargo-Nielsen-Tobacco-All-Channel-Report-Period-Ending-8.11.18.pdf (last visited Apr. 29, 2020).

[40] *See* note 9, *supra*.

## VIII.    ANTICOMPETITIVE EFFECTS

**Altria Agreed to Withdraw from Current and Future Competition in Exchange for the Opportunity to Share in Juul's Dominant Position**

88.    During the negotiations between Juul and Altria, Juul's executives made clear their position that Altria could not remain a competitor in the relevant market if there was to be a deal.

89.    On July 30, 2018, in advance of a meeting between Juul's lead negotiators, Nick Pritzker, a Juul Board member, emailed Howard Willard, the Altria CEO, an opening term sheet for discussions. The term sheet included the term that Altria must withdraw from the relevant market.

90.    On August 1, 2018, the negotiators met at the Park Hyatt Hotel in Washington, DC to discuss terms. The attendees of this meeting consisted of the lead negotiators for each side: Nick Pritzker and Riaz Valani, two members of Juul's Board of Directors, Kevin Burns, Juul's CEO, Howard Willard, Altria's CEO, and Billy Gifford, Altria's CFO. No attorneys were present from either side at this meeting.

91.    After this meeting, Altria's top executives understood that ceasing to compete in the e-cigarette business might be a condition for reaching a deal with Juul.

92.    When Altria sought to modify Juul's proposed non-compete term, Juul responded negatively and reiterated its demands. On August 9, 2018, Billy Gifford sent over a markup of the term sheet to Nick Pritzker, Riaz Valani, and Kevin Burns.

93.    On August 15, 2018, Riaz Valani of Juul met with Dinny Devitre, one of Altria's Board Members at Mr. Devitre's office in New York.

94.    After negotiations between Juul and Altria were suspended temporarily, Altria's executives knew that they had to reaffirm their commitment to meeting Juul's demands if they were to restart talks successfully. On October 5, 2018, Altria's Howard Willard sent Nick Pritzker, Riaz Valani, and Kevin Burns a letter assuring them that Altria would exit the market. Upon receiving this letter, Kevin Burns forwarded it to Juul's Chief Legal Officer. The concessions contained in this letter helped to restart the stalled negotiations. Soon after, Altria began to take key steps that would facilitate a possible wind down of the Nu Mark business.

26

95.    On October 25, 2018, Altria announced that it was temporarily halting its MarkTen Elite business, ostensibly out of concern that pod-based systems and nontraditional flavors could be contributing to youth usage. A few days later, Altria and Juul, which was the largest seller of a pod-based system and non-traditional flavors, agreed to basic deal terms, which included Altria not competing in the e-cigarette market.

96.    On December 7, 2018, after five years of continuous participation in the e-cigarette market, Altria announced its decision to wind down its remaining e-cigarette business, including its MarkTen cig-a-like.

97.    On December 9, 2018, Murray Garrick, Altria's General Counsel, emailed Jerry Masoudi, Chief Legal Officer at Juul, to discuss the deal.

98.    On December 20, 2018, less than two weeks after Altria announced its decision to discontinue its e-cigarette operations, Juul and Altria executed the transaction whereby Altria invested $12.8 billion and, in return, Juul issued stock to Altria amounting to a 35% ownership stake in the company.

99.    The transaction also closed routes to other potential acquisitions or partnerships through which Altria might have participated in the relevant market.

100.    Juul's conduct as alleged herein had the purpose, capacity, tendency, and effect of restraining competition unreasonably, and the transaction substantially lessened competition, in the U.S. market for closed-system e-cigarettes, in the following ways, among others:

a.    Eliminating Altria's competing products from the relevant market, thereby eliminating current and future price competition between Juul and Altria in particular promotional activity to create awareness and drive sales;

b.    Eliminating current and future innovation competition between Juul and Altria; and

c.    Eliminating current and future competition between Juul and Altria for shelf space at retailers through rebates and other incentives.

101.    Altria's agreement to exit the relevant market eliminated one of Juul's most dangerous rivals. As a large, well-established, and well-funded company with longstanding

relationships and significant shelf space with retailers nationwide, Altria had the resources and infrastructure to drive sales and compete aggressively.

102.    Before the shut-down of Nu Mark, Juul and Altria relied on price promotions to drive sales of their respective e-cigarette products. In addition, each monitored the other's pricing in setting its own strategy. Altria's decision to pull its MarkTen products brought this price competition to an end.

103.    In addition to price competition, Juul and Altria competed through product innovation, including device features and e-liquid formulations. For example, it was Juul's success that prompted Altria to acquire and further develop various pod-based e-cigarettes (including Elite), and to commit significant resources toward developing e-liquid formulations with nicotine salts and higher nicotine concentrations.

104.    Altria leveraged its ownership of leading brands across multiple tobacco categories in order to secure substantial and favorable shelf space at retailers throughout the United States. In 2018, for example, to Juul's alarm, Altria launched a major campaign to secure shelf space for its innovative tobacco products (including e-cigarettes), offerings retailers product discounts, slotting fees, and fixture payments. After the Transaction, instead of competing for shelf space, Altria leased its shelf space to Juul, effectively replacing its own MarkTen products with Juul's product.

105.    Based upon documents submitted to the Federal Trade Commission from Defendants it appears that before committing to the transaction, Altria had every intention of remaining in the relevant market for the long term. Altria's documents and executive statements repeatedly evince their recognition that e-cigarettes were the future of the tobacco industry and their absolute commitment to participate in that future. For example:

- Mr. Martin Barrington, Altria's former CEO, stated to investors: "We aspire to be the U.S. leader in authorized, non-combustible, reduced-risk products."[41]

---

[41]    Martin Barrington, CEO, Altria Group, Inc., *Address at the Consumer Analyst Group of New York Conference* (Feb. 21, 2018), https://www.sec.gov/Archives/edgar/data/764180/000076418018000020/exhibit992-2018cagnyremarks.htm (last visited Apr. 29, 2020).

- Mr. Howard Willard, Altria's current CEO, in an interview with the Wall Street Journal, stated: "At a time when e-vapor is going to grow rapidly and likely cannibalize the consumers we have in our core business, if you don't invest in the new areas you potentially put your ability to deliver that financial result at risk."[42]

106.   Instead of continuing to pursue its ambitions in the relevant market through competition, including aggressive price promotions, product development, and incentives for shelf space, Altria sought a short cut to market leadership by investing in its competitor. Altria agreed to abandon its long-standing and significant efforts at current and future competition in exchange for a significant share of Juul's profits resulting from a significantly less competitive marketplace.

## IX.   LACK OF COUNTERVAILING FACTORS

107.   Juul cannot demonstrate that entry into the relevant market by new competitors or expansion by existing competitors would be timely, likely, or sufficient to offset the anticompetitive effects of the conduct alleged above.

108.   The entry of new competitors into the relevant market is unlikely because the regulatory approval process is exceptionally time-consuming and expensive. Defendants themselves estimate that preparing a PMTA for an e-cigarette would require substantial time and investment.

109.   In addition to achieving regulatory approval, a new entrant would need to: (i) develop or acquire a product; (ii) manufacture the product at quality and scale; (iii) sell the product; (iv) develop a distribution system; and (v) develop a marketing plan, including a plan to secure shelf space in retail outlets.

110.   Existing closed-system e-cigarette competitors cannot effectively replace the lost competition because: (i) they lack Altria's brand strength to secure favorable shelf space at retailers; (ii) they lack the substantial resources Altria had at its disposal to commit to e-cigarette

---

[42]   Jennifer Maloney and Dana Mattioli, *Why Marlboro Maker Bet on Juul, the Vaping Upstart Aiming to Kill Cigarettes*, WALL ST. JOURNAL (Mar. 23, 2019), https://www.wsj.com/articles/why-marlboro-maker-bet-on-juul-the-vaping-upstart-aiming-to-kill-cigarettes-11553313678 (last visited Apr. 29, 2020).

research and development as well as to pursuing regulatory approval; and/or (iii) the FDA's enforcement of restrictions on e-liquid flavors has negatively impacted the competitive presence of closed-system competitors other than Juul, who had voluntarily discontinued its flavors earlier.

111.    Nor are open-tank e-cigarette manufacturers likely to replace the lost competition, in part because the impending PMTA deadline will likely cause many of them to shut down, and because they are largely sold in the separate "vape shop" sales channel and would not likely be able to expand rapidly into convenience stores, where closed-system e-cigarettes are typically sold.

112.    Defendants cannot demonstrate cognizable efficiencies that would be sufficient to rebut the presumption that the transaction substantially lessened competition in the relevant market. Nor can Defendants demonstrate pro-competitive benefits of the Transaction that could not have been achieved through alternative, less restrictive means.

113.    Thus, Juul's unlawful conduct eliminated competition in the relevant market and deprived Plaintiffs and the Class of the benefits of free and unrestrained competition that the antitrust laws were designed to ensure.

## X.    CLASS ACTION ALLEGATIONS

114.    Plaintiffs bring this class action on behalf of themselves and all others similarly situated under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons or entities in the United States that purchased e-cigarettes and/or pods indirectly from Juul, for personal use and not resale, from December 7, 2018 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period"). The following persons and entities are excluded from the Class: Defendants and their counsel, officers, directors, management, employees, parents, subsidiaries, and affiliates; federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities; and the judges in this case and any members of their immediate families.

115. Plaintiffs also bring this class action on behalf of themselves and all others similarly situated under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking damages and injunctive relief on behalf of the following Nationwide Cartwright Act Class ("the Cartwright Act Class"):

> All persons or entities in the States of Arizona, Arkansas, California, the District of Columbia, Florida, Guam, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, and Wisconsin who purchased e-cigarettes and/or pods indirectly from Juul, for personal use and not resale, from December 7, 2018 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").

116. Additionally, Plaintiffs bring this class action on behalf of themselves and all others similarly situated under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking damages and injunctive relief on behalf of the following State Classes:

> The California Class: All persons or entities in the State of California that purchased e-cigarettes and/or pods indirectly from Juul, for personal use and not resale, from December 7, 2018 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").

> The Florida Class: All persons or entities in the State of Florida that purchased e-cigarettes and/or pods indirectly from Juul, for personal use and not resale, from December 7, 2018 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").

117. The same persons and entities excluded from the Nationwide Class are excluded from each State Class.

118. The Class is sufficiently numerous. Plaintiffs believe that the Class is so numerous and widely geographically dispersed throughout the United States that joinder of all members is impracticable. Moreover, given the costs of complex antitrust litigation, it would be uneconomic for many plaintiffs to bring individual claims and join them together.

119.    Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiffs are aligned with, and not antagonistic to, those of the other members of the Class.

120.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation and have particular experience with indirect antitrust litigation on behalf of end user consumers.

121.    Questions of law and fact common to members of the Class predominate over questions, if any, that may affect only individual Class members, because Defendants have acted on grounds generally applicable to the entire Class. Such generally applicable questions are inherent in Defendants' wrongful conduct.

122.    Questions of law and fact common to the Classes include:

a.    whether the conduct alleged herein constitutes a violation of the federal antitrust laws;

b.    whether the U.S. and various State markets for closed-system e-cigarettes constitutes a relevant market;

c.    whether Defendants possess sufficient market power in the relevant market to cause anticompetitive effects;

d.    whether Juul possesses monopoly power in the relevant market;

e.    whether the conduct alleged herein caused anticompetitive effects in the relevant market(s);

f.    whether Defendants monopolized or attempted to monopolize the U.S. and various State markets for closed-system e-cigarettes;

g.    whether Defendants' conduct, as alleged in this Complaint, caused Plaintiffs and the Classes to pay supracompetitive prices for e-cigarettes and thereby suffer antitrust injury;

h.    the appropriate injunctive relief for the Classes; and

i.    the appropriate measure of damages sustained by Plaintiffs and other members of the Classes.

123.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

124.    Plaintiffs know of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## XI.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2
### (On Behalf of the Nationwide Class for Injunctive Relief)

125.    Plaintiffs repeat and reassert each of the allegations contained in the preceding paragraphs as if fully set forth herein.

126.    At all times relevant to this action, Defendants had monopoly power in the market for the sale of closed-system e-cigarettes in the United States. Juul controls at least 75% of the relevant market in the United States. Moreover, there are high barriers to entry in the market for closed-system e-cigarettes, including both technological and regulatory barriers.

127.    Defendants have engaged in exclusionary conduct designed to prevent competition on the merits in the relevant market for closed system e-cigarettes, and thereby maintain and enhance their monopoly position in that market.

128.    Defendants' anticompetitive conduct has decreased price competition in the relevant market, deprived consumers of free choice, and imposed antitrust price injury on wholesale distributors and end user customers.

129.    There are no legitimate business or pro-competitive justifications for Defendants' conduct and any purported legitimate business justifications are mere pretexts. Even if such a

justification existed, any purported pro-competitive benefits can be achieved through alternative means less restrictive of competition.

130.    If not enjoined, Defendants will continue to engage in anticompetitive conduct that will further injure wholesalers, end users, and competition.

## SECOND CLAIM FOR RELIEF
### Violation of California's Cartwright Act,
### Cal. Bus. & Prof. Code § 16700, *et seq.*
### (By All Plaintiffs on Behalf of the Cartwright Act Class)

131.    Plaintiffs repeat and reassert each of the allegations contained in the preceding paragraphs as if fully set forth herein.

132.    The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California.

133.    California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

134.    Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).

135.    A trust in California is any combination intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of merchandise, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. *Id.* at § 16726.

136.    Plaintiffs purchased closed-system e-cigarettes within the State of California during the Class Period.  But for Defendants' conduct set forth herein, the price of closed-system e-cigarettes would have been lower, in an amount to be determined at trial.

137.    Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof.

Code § 16700, *et seq.*

138.    Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct preventing Plaintiffs in the exercise of due diligence from uncovering the unlawful conduct.

139.    Plaintiffs and members of the Cartwright Act Class were injured in their business or property, with respect to purchases of closed-system e-cigarettes nationwide and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

## THIRD CLAIM FOR RELIEF
### Violation of California's Cartwright Act,
### Cal. Bus. & Prof. Code § 16700, *et seq.*
**(By Plaintiffs Daraka Larimore and Adam Matschullat on Behalf of the California Class)**

140.    Plaintiffs Daraka Larimore and Adam Matschullat repeat and reassert each of the allegations contained in the preceding paragraphs as if fully set forth herein.

141.    The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California.

142.    California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

143.    Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).

144.    A trust in California is any combination intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of merchandise, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. *Id*. at § 16726.

145.    Plaintiffs Daraka Larimore and Adam Matschullat purchased closed-system e-cigarettes within the State of California during the Class Period.  But for Defendants' conduct set

forth herein, the price of closed-system e-cigarettes would have been lower, in an amount to be determined at trial.

146.    Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code § 16700, *et seq.*

147.    Defendants wrongfully concealed the facts alleged herein giving rise to their unlawful conduct preventing California plaintiffs in the exercise of due diligence from uncovering the unlawful conduct.

148.    Plaintiffs Daraka Larimore and Adam Matschullat and members of the California Class were injured in their business or property, with respect to purchases of closed-system e-cigarettes in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

<u>**FOURTH CLAIM FOR RELIEF**</u>
**Violations of California's Unfair Competition Law**
**Cal.  Bus. & Prof. Code § 17200, *et seq.* (the "UCL")**
**(By Plaintiffs Daraka Larimore and Adam Matschullat on Behalf of the California Class)**

149.    Plaintiffs Daraka Larimore and Adam Matschullat repeat and reassert each of the allegations contained in the preceding paragraphs as if fully set forth herein.

150.    The violations of federal antitrust law set forth above also constitute violations of section 17200, *et seq.* of California Business and Professions Code.

151.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the UCL by engaging in the acts and practices specified above.

152.    This claim is instituted pursuant to sections 17203 and 17204 of California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated the UCL.

153.    The Defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a

common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; and (2) the violations of section 16720, *et seq.*, of California Business and Professions Code, set forth above.

154.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of section 16720, *et seq.*, of California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

155.    Plaintiffs Daraka Larimore and Adam Matschullat and members of the California Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

156.    The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

157.    The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the California Class to pay supra-competitive and artificially-inflated prices for closed-system e-cigarettes sold in the State of California. Plaintiff and the members of the California Class suffered injury in fact and lost money or property as a result of such unfair competition.

158.    As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff and the members of the California Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendant as a result of such business practices, pursuant to California Business and Professions Code sections 17203 and 17204.

/ / /

/ / /

**FIFTH CLAIM FOR RELIEF**

**Violation of the Florida Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. § 501.201(2)**, *et seq.*
**(By Plaintiff Keith May on Behalf of the Florida Class)**

159.    Plaintiff Keith May repeats and reasserts each of the allegations contained in the preceding paragraphs as if fully set forth herein.

160.    The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, *et seq.* (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Florida Stat. § 501.204(1).

161.    The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.202(2).

162.    A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

163.    Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. Fla. Stat. § 501.211(a) ("…anyone aggrieved by a violation of this [statute] may bring an action…").

164.    Plaintiff Keith May purchased closed-system e-cigarettes within the State of Florida during the Class Period. But for Defendants' conduct set forth herein, the price per unit of Packaged Tuna would have been lower, in an amount to be determined at trial.

165.    Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the closed-system e-cigarettes market, a substantial part of which occurred within Florida.

166.    Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for closed-system e-cigarettes, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher

than the competitive market level, beginning at least as early as 2018 and continuing through the date of this filing.

167.    Accordingly, Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

168.    Defendants' unlawful conduct substantially affected Florida's trade and commerce.

169.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff Keith May and the members of the Florida Class have been injured in their business or property by virtue of overcharges for closed-system e-cigarettes and are threatened with further injury.

170.    By reason of the foregoing, Plaintiff Keith May and the members of the Florida Class are entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. §501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

### SIXTH CLAIM FOR RELIEF
### Unjust Enrichment
### (By Plaintiffs of Behalf of Each State Class, Respectively)

171.    Each Plaintiff repeats and reasserts each of the allegations contained in the preceding paragraphs as if fully set forth herein on behalf of the State Class in which he or she purchased closed-system e-cigarettes.

172.    Plaintiffs purchased closed-system e-cigarettes within their States of residence during the Class Period. But for Defendants' conduct set forth herein, the price of closed-system e-cigarettes would have been lower, in an amount to be determined at trial.

173.    Defendants unlawfully overcharged Plaintiffs and end payers, who made purchases of Defendants' closed-system e-cigarettes in their States of residence at prices that were more than they would have been but for Defendants' actions.

174.    Defendants have been enriched by revenue resulting from unlawful overcharges for Juul's closed-system e-cigarettes.

175.    Plaintiffs and State Class members have been impoverished by the overcharges for Defendants' closed-system e-cigarettes resulting from Defendants' unlawful conduct.

176.    Defendants' enrichment and Plaintiffs' impoverishment are connected. Defendants have paid no consideration to any other person for any benefits they received from Plaintiffs and State Class Members.

177.    There is no justification for Defendants' receipt of the benefits causing their enrichment and Plaintiffs' and Class members' impoverishment, because Plaintiffs and State Class members paid anticompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

178.    Plaintiffs and State Class members have no remedy at law.

## XII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

(A)    Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and designating Plaintiff as class representative and Plaintiff's counsel as Class Counsel;

(B)    Award Plaintiffs and the Class damages in an amount to be determined at trial, plus interest in accordance with law;

(C)    Enter judgment against Defendant and in favor of Plaintiffs and the Class;

(D)    Declare the agreements alleged herein invalid and unenforceable;

(E)    Grant injunctive relief that restores Defendants' incentives to compete in the relevant market, including, as appropriate, divestiture of Altria's equity stake in Juul, rescission of Altria's purchase of that stake, and/or any other relief ;

(F)    Award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees, as provided by law; and

(G)    Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

/ / /

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Dated: April 30, 2020

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**

By:     /s/ Rachele R. Byrd
BETSY C. MANIFOLD
RACHELE R. BYRD
MARISA C. LIVESAY
BRITTANY N. DEJONG
750 B Street, Suite 1820
San Diego, CA 92101
Telephone:   619/239-4599
Facsimile:    619/234-4599
manifold@whafh.com
byrd@whafh.com
livesay@whafh.com
dejong@whafh.com

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
FRED T. ISQUITH
THOMAS H. BURT
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
isquith@whafh.com
burt@whafh.com

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC**
CARL V. MALMSTROM
111 W. Jackson Blvd., Suite 1700
Chicago, IL 60604
Tel: (312) 984-0000
Fax: (212) 686-0114
malmstrom@whafh.com

*Counsel for Plaintiffs*

26422